No. 22-16018

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ALEXANDER STEWART AND ANDREW CONWAY,

*Plaintiffs-Appellants*

v.

CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA, ROSANNA
PEREZ, Park Ranger with San Francisco Recreation and Parks Department,
JONATHAN WEBB, Park Ranger with San Francisco Recreation and Parks
Department, and JESSICA WALLACE, Park Ranger with San Francisco
Recreation and Parks Department

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 4:122-cv-01108-YGR (Honorable Yvonne Gonzalez Rogers)

## BRIEF OF APPELLANTS

Nathan W. Kellum                     Robert H. Tyler
TN BAR #13482; MS BAR # 8813         CA SBN 179572
Center for Religious Expression      Advocates for Faith and Freedom
699 Oakleaf Office Lane, Suite 10    25026 Las Brisas Rd.
Memphis, TN 38117                    Murrieta, CA  92562
(901) 684-5485                       (951) 304-7583
nkellum@crelaw.org                   btyler@faith-freedom.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION AND REQUEST FOR ORAL ARGUMENT ...........................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................3

STATEMENT OF THE CASE ................................................................5

SUMMARY OF ARGUMENT ..............................................................21

STANDARD OF REVIEW .................................................................22

ARGUMENT .................................................................................23

   I.   STEWART AND CONWAY WILL VERY LIKELY SUCCEED
       ON THE MERITS OF THEIR CONSTITUTIONAL
       CLAIMS .............................................................................25

      A. Section 7.03 is Unconstitutional As Applied to Stewart's
         and Conway's Worship in Public Parks .................................30

         1.  San Francisco unconstitutionally applies § 7.03(j)
            regulating "social gatherings" to worship ...........................31

            a.   application of "social gatherings" park rule violates
               free speech.................................................................31

ii

b. application of "social gatherings" park rule violates
due process ....................................................................34

c. application of "social gatherings" park rule violates
free exercise of religion..............................................36

2. San Francisco unconstitutionally applies §§ 7.03(i)
and 7.03(m) to amplified praise songs in worship ............................37

a. permit requirement for amplification in traditional
public forum violates the liberty of speech clause in
California Constitution and free speech clause in
U.S. Constitution .........................................................38

b. applying permit requirement for amplification
involving "musical performance" to praise music
in worship violates due process....................................41

3. San Francisco unconstitutionally applies § 7.03(t)
to a portable folding table Stewart and Conway use
for expressive purposes in worship .....................................42

a. application of section 7.03(t) to a small portable
folding table used for communion in worship violates
liberty of speech clause in California Constitution and
free speech clause in U.S. Constitution .........................43

b. application of section 7.03(t) to a small portable
folding table used for communion in worship
violates due process .......................................................44

4. San Francisco fails to leave Stewart and Conway
with any open ample alternative channels of communication ...........45

B. Section 7.03 is Unconstitutional on its Face ............................................46

    1. The ordinance violates liberty of speech clause in California Constitution and free speech clause in U.S. Constitution ................................................................46

    2. The ordinance violates due process....................................................51

    3. The ordinance violates equal protection..............................................52

II. UNLESS THIS COURT GRANTS INJUNCTIVE RELIEF, STEWART AND CONWAY WILL SUFFER IRREPARABLE HARM ...............................................................53

III. ALLOWING STEWART AND CONWAY TO WORSHIP IN THE PUBLIC PARK IS HARMLESS TO THE CITY AND THE FREEDOM TO DO SO SERVES THE BEST INTERST OF THE PUBLIC ........................................................53

CONCLUSION ................................................................54

CERTIFICATE OF SERVICE ..............................................55

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*ACLU of Nevada v. City of Las Vegas,*
    466 F.3d 784 (9th Cir. 2006) ................................................. 28, 43

*ACLU of Nevada v. City of Las Vegas,*
    333 F.3d 1092 (9th Cir. 2003) .......................................................26

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .......................................................24

*Assoc. Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012) .........................................................54

*Baldwin v. Redwood City,*
    540 F.2d 1360 (9th Cir. 1976) ................................................. 49, 50

*Bates v. City of Little Rock,*
    361 U.S. 516 (1960) .......................................................................50

*Berger v. City of Seattle,*
    569 F.3d 1029 (9th Cir. 2009) ......................................... 27, 28, 38

*Bose Corp. v. Consumers Union of United States, Inc.,*
    466 U.S. 485 (1984) .......................................................................23

*Boyer v. City of Simi Valley,*
    978 F.3d 618 (9th Cir. 2020) ..................................................... 32, 33

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) .......................................................................29

*Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics,*
    29 F.4th 468 (9th Cir. 2022) .........................................................23

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC,*
    142 S. Ct. 1464 (2022) ..................................................................46

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) .........................................................................35

*City of Cleburne v. Cleburne Living* Ctr.,
  473 U.S. 432 (1985) .......................................................................30

*Clark v. Jeter*,
  486 U.S. 456 (1988) .......................................................................30

*Cuviello v. City of Vallejo*,
  944 F.3d 816 (9th Cir. 2019) ................................................. *passim*

*EEOC v. Roman Catholic Diocese*,
  213 F.3d 795 (4th Cir. 2000) .........................................................37

*Edwards v. South Carolina*,
  372 U.S. 229 (1963) .......................................................................26

*Elrod v. Burns*,
  427 U.S. 347 (1976) .......................................................................53

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
  494 U.S. 872 (1990) ................................................................. 29, 36

*Epona v. Cty. of Ventura*,
  876 F.3d 1214 (9th Cir. 2017) ........................................................27

*Forsyth Cty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................. 48, 51

*Foti v. City of Menlo Park*,
  146 F.3d 629 (9th Cir. 1998) .........................................................46

*Frisby v. Schultz*,
  487 U.S. 474 (1988) ................................................................. 26, 49

*Fulton v. City of Philadelphia, Pennsylvania*,
  141 S. Ct. 1868 (2021) ..............................................................29, 36

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ........................................................... 29, 41, 42

vi

*Grossman v. City of Portland,*
    33 F.3d 1200 (9th Cir.2004)................................................................27

*Hague v .CIO,*
    307 U.S. 496 (1939)........................................................................26

*Heffron v. Int'l Soc'y for Krishna Consciousness,*
    452 U.S. 640 (1981)........................................................................26

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011)............................................................28

*Kaahumanu v. Hawaii,*
    682 F.3d 789 (9th Cir. 2012)............................................................27

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022)....................................................................29

*Kolender v. Lawson,*
    461 U.S. 352 (1983)................................................................ 29, 42

*Kuba v. 1-A Agric. Ass'n,*
    387 F.3d 850 (9th Cir. 2004)......................................................26, 41

*Long Beach Area Peace Network v. City of Long Beach,*
    574 F.3d 1011 (9th Cir. 2009)..........................................................28

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958)........................................................................50

*One World One Family Now, Inc. v. Nevada,*
    860 F. Supp. 1457 (D. Nev. 1994)....................................................43

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983)..........................................................................26

*Pom Wonderful LLC v. Hubbard,*
    775 F.3d 1118 (9th Cir. 2014)..........................................................24

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .......................................................................28

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ......................................................... 28, 32, 46

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ......................................................25

*Saia v. People of State of New York*,
    334 U.S. 558 (1948) ............................................................... 26, 37

*Schneider v. New Jersey*,
    308 U.S. 147 (1939) .....................................................................49

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) .....................................................................28

*Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*,
    502 U. S. 105 (1991) ....................................................................28

*Thomas v. Chicago Park Dist.*,
    534, U.S. 316 (2002) ..............................................................27, 51

*Thunder Studios, Inc. v. Kazal*,
    13 F. 4th 736 (9th Cir. 2021) .......................................................23

*Tucker v. City of Fairfield*,
    398 F.3d 457 (6th Cir. 2005)........................................................44

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ..................................................... 28, 34, 50, 53

*Widmar v. Vincent*,
    454 U.S. 263 (1981) .....................................................................25

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .........................................................................24

## <u>Statutes</u>

28 U.S.C. § 1292 .......................................................................................3

28 U.S.C. § 1331 .......................................................................................2

28 U.S.C. § 1343 .......................................................................................2

## INTRODUCTION AND REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellants ("Stewart" and "Conway"), evangelical Christians and spiritual leaders in Christ's Forgiveness Ministries San Francisco church plant ("CFM"), wish to participate in religious worship with their friends and fellow believers in San Francisco public parks. But Defendants-Appellees (collectively as "San Francisco" or "City") inhibit this expression, issuing to CFM four separate citations on four separate occasions in four separate parks for not securing a permit in advance from the City to conduct this benign exercise of their religious faith.

Thwarting their worship, San Francisco calls upon a wide array of vague, content-intensive rules embedded in its Park Code. Stewart and Conway must obtain a permit for participating in a "religious event" with 50 or more people under § 7.03(h) or a "social gathering" with 25 or more people under § 7.03(j). They also need a permit for sound amplification used for their praise songs under § 7.03(i) because the City considers their singing a "musical performance" or otherwise under § 7.03(m). Additionally, Stewart and Conway are obliged to have a permit for a putting out a small portable folding table they want to use for communion during their worship under § 7.03(t).

Aside from the imposition associated with applying for and obtaining a permit from the City for their constitutionally-protected activity, Stewart and Conway must pay a fee, comply with a health and safety plan, secure a certificate of insurance for

1

coverage of two millions dollars, provide a bond, and comply with any other dictate the City wishes to place on them, just to meet and gather for worship with a small number of believers in a public park.

Seeking relief from the park rules, Stewart and Conway pursued a motion for preliminary injunction in the court below. But the ruling left them wanting. While the court technically granted partial relief, enjoining the permit requirement in § 7.03(h) for religious events with 50 or more people, San Francisco remains free to apply § 7.03(j) for "social gatherings" to Stewart and Conway instead, forcing them to obtain a permit for worship with 25 people. And San Francisco maintains permit requirements for using a sound amplifier or a small portable folding table, instruments of speech that are essential to Stewart's and Conway's worship activity.

San Francisco's Park Code violate Stewart's and Conway's constitutional rights facially and as applied to their worship activity in public parks. For and from which, Stewart and Conway require relief as soon as practicable in the form of a suitable preliminary injunction.

To resolve the nuanced and important constitutional issues raised on this appeal, oral argument should prove helpful to the Court.

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367 because Stewart and Conway pursue claims under the United States

Constitution and under federal law, as well as the California Constitution. Appellate jurisdiction is premised on 28 U.S.C. § 1292(a)(1). On June 22, 2022, the district court entered an Order on Stewart's and Conway's motion for preliminary injunction, granting the request in part and denying in part. (ER 5-22). Stewart and Conway filed their notice of appeal on a timely basis, on July 13, 2022. (ER 138-39).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Is City's permit requirement and attendant burdens for religious worship in a public park with 25 or more people, by classifying the event as a social gathering, in violation of…

    a.  the liberty of speech clause of the California Constitution and/or the free speech clause of the U.S. Constitution?

    b.  the free exercise clause of the U.S. Constitution?

    c.  the due process clause of the U.S. Constitution?

2.  Is City's permit requirement and attendant burdens for using sound amplification with praise songs in religious worship in a public park, by classifying the activity as a musical performance or otherwise, in violation of…

    a.  the liberty of speech clause of the California Constitution and/or the free speech clause of the U.S. Constitution?

    b.  the due process clause of the U.S. Constitution?

3.    Is City's permit requirement and attendant burdens for using a small portable folding table with communion during religious worship in a public park, by classifying it as a structure or otherwise, in violation of…

    a. the liberty of speech clause of the California Constitution and/or the free speech clause of the U.S. Constitution?

    b. the due process clause of the U.S. Constitution?

4.    Does City's permit requirement that effectively precludes religious worship in all public parks and other public places at all times fail to leave open ample alternative means for the desired expression, in violation of the liberty of speech clause of the California Constitution and/or the free speech clause of the U.S. Constitution?

5.    Is City's permit requirement with content-based and vague terminology, supplying overly broad discretion to decision-makers, in facial violation of…

    a. the liberty of speech clause of the California Constitution and/or the free speech clause of the U.S. Constitution?

    b. the due process clause of the U.S. Constitution?

    c. the equal protection clause of the U.S. Constitution?

4

6.     Is the ongoing threat of the City applying its unconstitutional permit requirement to effectively bar religious worship in public parks a sufficient basis for granting a preliminary injunction?

## STATEMENT OF THE CASE

### *Stewart, Conway, and their Desire to Worship with CFM*

Stewart and Conway are evangelical Christians and leaders with CFM, a community of Christians who gather and worship together in the San Francisco area. (Excerpts of Record [ER] 105-106). CFM is a non-denominational Christian ministry from Canada that seeks to serve the world through evangelism and church planting. (ER 105).

Representing an important tenet of their Christian faith and practice, Stewart and Conway participate in regular, weekly assembly of worship with others. (ER 105-106). They believe biblical corporate worship includes preaching, reading the bible, teaching from the bible, public prayer, singing and playing of instruments for praise songs, along with observation of communion, which is a ceremonial presentation of bread and wine symbolizing the body and blood of Jesus Christ. (ER 106-107).

As part of a church plant that does not own property, Stewart and Conway wish to conduct their worship services in San Francisco public parks. (ER 107). Public parks are uniquely suitable for their worship, since they are free, freely

accessible, and compatible with their religious activities. (ER 107). Other churches in the CFM network likewise utilize outdoor public parks to conduct their worship services. (ER 107).

A typical CFM worship service has somewhere between 40 to 70 attendees. (ER 107). The service begins with music and praise songs, followed by speaking and testimonies, communion and offering, a sermon from a biblical passage, and a closing prayer. (ER 107). The church need amplification for the music and praise songs, as well the preaching, so attendees can hear, understand, and participate in the worship. (ER 107). Stewart, Conway, and others attending the service cannot effectively participate in the worship without amplification. (ER 107). They also require a table for facilitating communion, to hold up containers of bread and wine for distribution of the elements. (ER 106, 108).

### *Attempt to Worship at Palace of Fine Arts Park*

On Sunday, January 24, 2021, Stewart and Conway and others with CFM gathered in an outdoor space at the Palace of Fine Arts, a public park in San Francisco, to participate in worship. (ER 108). Palace of Fine Arts is an attractive and unique venue with domes and columns, an idyllic setting for worship. (ER 108). The spot is also a centrally located, near the Golden Gate bridge, and easy for their participants to find. (ER 108).

As Stewart and Conway were participating in worship that morning, a park ranger with San Francisco Recreation and Parks Department ("SFRPD"), Rosanna Perez, approached the group and addressed Stewart as a leader. (ER 108-109). The ranger informed Stewart the church needed a permit under Park Code § 7.03(i), which requires a permit for a "musical performance" with sound amplification. (ER 82, 109). Foregoing a warning, Ranger Perez issued them a citation, carrying a fined of $192.00. (ER 78, 109). Stewart and Conway disagreed with the ranger's depiction of their worship service as a "musical performance," but paid the fine, determined to find another park where they could worship freely. (ER 109).

### *Attempt to Worship at Potrero de Sol Park*

Stewart and CFM believed the park rule restricting amplification was limited to the Palace of Fine Arts Park due to the iconic and touristy nature of that venue. (ER 109). He and other church leaders decided to go to Potrero de Sol Park, another San Francisco public park, for their next worship service, believing they could worship freely there. (ER 109-110). Though not as popular as Palace of Fine Arts, they considered the park a good spot for their worship. (ER 110).

On that day, Sunday, February 7, 2021, they had roughly 50 people in attendance. (ER 110). But about 30 minutes into the worship, Ranger Jonathan Webb ("Webb") arrived and spoke with Stewart and Ryan Simpkins ("Simpkins"), informing them that the church could not conduct their worship with amplification.

7

(ER 110). Stewart observed they were not causing a disruption, but the ranger countered that he had received complaints. (ER 110). To alleviate any possible concerns about noise, Stewart and Simpkins assured that they would turn down the volume. (ER 110). The ranger was not moved. (ER 110-111). He informed the issue was amplification, not noise level, and that he was obligated to enforce the park rules (ER 1110-111). The ranger wrote out a citation to CFM for violating § 7.03(i), for not having a permit to use amplification in a musical performance in the park. (ER 79, 111).

Simpkins explained they were willing to work with the City and offered to turn off the amplifier in an effort to appease, but Ranger Webb informed a citation was required because the church had previously violated a park rule at another park. (ER 111). Simpkins objected to the citation on constitutional grounds, but Ranger Webb was not interested in debating the matter, inviting them to contest the issue in the court system. (ER 111). Stewart asked if he could see the park rule and discern how they violated it, but Ranger Webb declined, informing that he does not typically show people the laws they violate, and handed them the citation. (ER 79, 111-112).

Two San Francisco police officers joined the conversation and Ranger Webb reiterated his warning Stewart and Simpkins to turn off the amplification and disperse. (ER 112). Stewart asked to see the park rule again, but Ranger Webb declined again. (ER 112). The ranger confirmed, though, that the citation was for

8

use of amplification without a permit. (ER 112). Confused by the stance, Stewart and Simpkins asked if permit is needed for a protest in a San Francisco park and the police officers indicated no permit is needed for an unplanned protest. (ER 112). Simpkins said they could depict the church gathering as a protest, but officers did not respond to this suggestion. (ER 112). Ranger Webb gave them another warning and walked off with the other officers. (ER 112).

Seeing no viable option for continuing their worship, and wanting to avoid arrest, Stewart, Conway, and the others left the park. (ER 112-113). Stewart later noticed the fine for the citation doubled, totaling $384.00, and he paid it to avoid further difficulty. (ER 79, 113). But he and other church leaders were determined to not incur any future fines for worshipping in public places. (ER 113).

### Attempt to Worship at McClaren Park

Stewart, Conway, along with others in the CFM, were discouraged from worshipping in public parks due to their encounters with park rangers and the citations they received. (ER 113). Hoping to avoid another fine, they elected to go to a different public park where amplification was not as critical for audibility, settling on McClaren Park as the venue of choice. (ER 113). Stewart, Conway, and other church leaders believed the acoustics in an area near the basketball court in McClaren Park would allow them to worship without amplification, although they were unsure of how well they could be heard without amplification. (ER 113).

On Sunday, February 21, 2021, Stewart, Conway, and other members of CFM church met at McClaren Park for worship. (ER 113-114). They gathered in the spot near the open-air basketball court with the good acoustics. (ER 114). Around 50 people participated in worship that day, and while the lack of amplification hampered their ability to communicate with attendees clearly, the acoustics in that particular area made their worship doable. (ER 114).

However, after enjoying worship for an hour or so, Park Ranger Muyco walked up to the worship gathering as Stewart was preaching. (ER 114). Another church leader, Ahmed Akbar ("Akbar"), left the worship service to meet with Ranger Muyco on a nearby sidewalk where the ranger informed the church needed a permit for their worship. (ER 114). Akbar took issue with the position, pointing out that they were not using amplification, but the ranger informed they still needed a permit due to the number of people gathering for their worship service. (ER 114). The ranger added that he had received a complaint and would appreciate the church group packing up and leaving. (ER 114-115).

Akbar voiced his concerns with Ranger Muyco, explaining how other park rangers only warned them about amplification, not the number of participants. (ER 115). Ranger Muyco repeated the need for a permit, telling Akbar that they were in violation of a park rule and had to clear out, and the best he could do was give them a few minutes to wrap it up. (ER 115). Stressing the church's need to obtain a permit,

10

the ranger elaborated that he does not make up the park rules but enforces them. (ER 115). Akbar responded that the church respects the ranger's authority but hoped the ranger would take into consideration that the prior warning was about amplification and they had complied with that requirement. (ER 115).

Ranger Muyco walked toward the gathering and Simpkins left the worship to speak with him. (ER 115). The ranger reiterated to Simpkins that the church needed a permit. (ER 115-116). Simpkins asked why a permit was required for worship in a public park and the ranger referenced the number of people attending their religious event. (ER 116).

After Ranger Muyco spoke with someone on a hand-held radio for approximately 15 minutes, he resumed the conversation, now accompanied by Ranger Wallace. (ER 116). Ranger Muyco advised again that the church had to leave the park. (ER 116). Akbar cited his freedom of speech and freedom to gather. (ER 116). At this point, Ranger Wallace interjected and asked if they were about to wrap up their activity, adding that people walk by, see the church gathering, and complain to park rangers. (ER 116-117). She said they needed a permit. (ER 117).

Akbar informed Ranger Wallace that previous park rangers had specified a concern over amplification and did not mention any concerns about the number of attendees and asked if they could let the Stewart complete his sermon. (ER 117).

11

Ranger Wallace indicated that Stewart could finish his delivery, but the crowd needed to spread out due to concerns over COVID-19. (ER 117).

Both rangers walked away, and the church leaders ended the worship service, believing the issue was resolved. (ER 117). But as they were packing up, Ranger Wallace approached and wrote out a citation to them for violating a park rule. (ER 80, 82, 117-118). Akbar was perplexed by this development and reluctant to provide his personal information. (ER 117) Ranger Wallace said the citation was as a reminder that the church needed to secure a permit. (ER 117).

Akbar asked Ranger Wallace about the requisite number of attendees for worship that prompt the need for a permit. (ER 118). But Ranger Wallace said she did not know the precise number, explaining she does not work in the permits department. (ER 118). Akbar questioned Ranger Wallace how she could issue a citation without having some number in mind. (ER 118). But the ranger ignored the objection and encouraged him and the church to obtain a permit for their next worship gathering in a public park. (ER 118). Ranger Wallace issued a citation for using a portable table during communion in violation of § 7.03(t), with a fine for $384.00. (ER 80, 82, 118).

### *Attempt to Worship at United Nations Plaza*

Despite the concerning and constant presence of park rangers at their worship services and the recurring citations they received, Stewart, Conway, and the rest of

12

the church still yearned to worship in public places. (ER 118). The church next chose, for Sunday, March 21, 2021, to go to a public space in the United Nations (U.N.) Plaza, believing the area was not a public park and under federal control. (ER 119).

Stewart, Conway, and others in CFM began their worship service with approximately 50 people in attendance. (ER 119). But as with previous worship services, a park ranger, this time Ranger Wallace, soon arrived to stop the worship. (ER 119). She wrote out a citation to the church for violating § 7.03 in addition to violating an ordinance about posting signs. (ER 81, 119; *see* ER 82). The ranger did not specify the subsection of § 7.03 for which she was issuing the citation. (ER 82, 119). She scratched out reference to § 7.03(i)(2) dealing with amplification. (ER 82, 119).

### *Attempt to Obtain Permit to Worship in San Francisco Public Parks and Places*

Seeking to avoid further interference with their worship and additional citations, Conway, on behalf of the church, explored the need for a permit and the process for obtaining one. (ER 119-120). On March 22, 2021, Conway contacted the San Francisco park permit department about a permit to conduct worship activity in a public park. (ER 120). The official directed him to fill out an online application for a permit. (ER 120). Conway also looked up the permit requirement in San Francisco Park Code, § 7.03, which reads in its entirety:

13

No person shall, without a permit, perform any of the following acts in any park:

(a) Conduct or sponsor a parade involving (1) 50 or more persons; (2) the use of any street in any park; or (3) vehicles.

(b) Conduct or sponsor an event in which persons engage in petitioning, leafletting, demonstrating or soliciting when the number of petitioners, leafletters, demonstrators, or solicitors engaging in one or more of these activities involves 50 or more such persons at the same time within an area circumscribed by a 500 foot radius.

(c) Engage in soliciting in the Music Concourse Area of Golden Gate Park. This subsection shall not preclude the Commission from prohibiting persons from soliciting inside the Japanese Tea Garden.

(d) Sell or offer for sale books, newspapers, periodicals or other printed material.

(e) Conduct or sponsor any exhibit, promotion, dramatic performance, theatrics, pantomime, dance, fair, circus, festival, juggling or other acrobatics or show of any kind or nature which has been publicized four hours or more in advance.

(f) Perform any feat of skill or produce any amusement show, movie or entertainment which has been publicized four hours or more in advance.

(g) Make a speech which has been publicized four hours or more in advance.

(h) Conduct or sponsor a religious event involving 50 or more persons;

(i) Conduct or sponsor a concert or musical performance which (1) has been publicized four hours or more in advance, or (2) utilizes sound amplification equipment, or (3) involves a band or orchestra.

(j) Participate in a picnic, dance or other social gathering involving 25 or more persons.

(k) Sell or provide food to persons, except that no permit is required when a person participating in a picnic or social gathering of 25 or fewer persons provides food to others who are also participating in the picnic or social gathering.

(l) Conduct or sponsor a race or marathon which involves 25 or more persons as participants or which obstructs or interferes with the normal flow of vehicular or pedestrian traffic.

(m) Conduct or sponsor any event which utilizes sound amplification equipment, as defined in Part II, Chapter VIII (Police Code) of the San Francisco Municipal Code.

(n) Conduct or sponsor an exhibition.

(o) Conduct or sponsor an animal show.

14

(p) Conduct a wedding ceremony.
(q) Conduct or sponsor an art show.
(r) Operate any amusement park device. The Commission may prohibit the operation of such devices in any park or, if it allows such operation, may designate those locations where such operation is permitted.
(s) Conduct or sponsor an organized kite-flying event of any club or organization.
(t) Station or erect any table, scaffold, stage, platform, rostrum, tower, stand, bandstand, building, fence, wall, monument, dome or other structure.

(ER 82, 120-121).

After reviewing § 7.03, Conway determined the church would need a permit for the worship activity under the park rules, noticing § 7.03(h) requires a permit for a "religious event" in a public park involving 50 or more people. (ER 82, 121). He filled out the permit application on this same date, requesting use of U.N. Plaza, for the upcoming Sunday of March 28, 2021, and for the consecutive Sundays thereafter, listing McClaren Park as second choice as required by the application. (ER 70, 94-96, 121). Seeing if they could avoid the permit requirements, he labelled the activity as a "protest," but acknowledged the religious nature of the event and that the group anticipated 50 people. (ER 121).

The following day, March 23, 2021, Shauna Bogetz ("Bogetz"), Supervisor of Special Events, Permits and Reservations with SFRPD, emailed Conway about his application, copying Stacey Cataylo, another employee in the Special Events, Permits and Reservations Department, on the email, confirming the church's need for a permit for their worship. (ER 92-93, 122). In her email, Bogetz, stated U.N.

Plaza could not accommodate a group of the church's size due to social distancing requirements. (ER 92, 122). She said McClaren Park was available, but only in a lawn area that sits across from the parking lot. (ER 92, 122; *see* ER 64). She further informed Conway that the church group could only obtain three permits at a time and would have to apply for new permits after exhausting those. (ER 92, 122).

The lawn area in McClaren Park was not ideal, the church preferred the area near the basketball court, but Conway was determined to secure an available space in a park. (ER 122). He emailed Bogetz later that day, on March 23, 2021, and indicated they wanted to pursue the permit for the lawn area space in the park, asking about next steps in the process. (ER 92, 122).

On the following day, March 24, 2021, Cataylo contacted Conway over the phone, seeking details about worship activities taking place in the park, and Conway explained how the worship service would work, with preaching, music, and prayer with amplification, and communion. (ER 122). Also, during this phone call, Cataylo elaborated on the requirements the church would need to fulfill to obtain a permit, including a health and safety plan (mandating the signature of every attendee of worship to ensure compliance with COVID protocols), a certificate of insurance with $2 million coverage, payment of the permit fee, and a bond. (ER 122-123). Cataylo followed up with an email to Conway on this same day of March 24, 2021, confirming the worship activities of the church in the park and the requirements for

the permit. (ER 90-91, 123). Receiving this email, Conway emailed back on March 25, 2021, thanking Cataylo and advising her that he would follow up with any questions. (ER 90, 123).

Later that afternoon, on March 25, 2021, Cataylo wrote Conway again, informing him that San Francisco had set up an invoice for the CFM to pay to complete the permit process, warning that any sound extending beyond the picnic area could result in the church incurring additional cost for having a park ranger come and staff the event. (ER 89, 123). Conway passed along the information to Stewart and other church leaders and they determined the church could not go forward with the permit due to the cost and burdensome requirements, and wanted to see if it was possible to elude the permit requirements altogether. (ER 123).

To avoid the hassle and costs associated with the permit, the church was willing to cap attendance at 49 individuals and so advised the parks department. (ER 87-88, 123-124). However, Cataylo reminded Conway via email: "A permit is needed in order to set anything up – such as a table. A permit is also needed if you have amplified sound." (ER 86, 124). Conway sought clarification of the requirements (ER 86) San Francisco confirmed CFM needs a permit to use any public park space if they have 50 or more people, use amplification, or put up a table. (ER 85, 124).

Due to the park rules and onerous permit restrictions, Stewart, Conway, and other CFM leaders resolved they could not use public parks for their worship. (ER 124).

### *San Francisco Maintains Ongoing Restriction on Worship in Public Parks*

On April 15, 2021, Stewart and Conway sent a letter to the Mayor of San Francisco, City Attorney, and SFRPD Chief Park Ranger, seeking relief from the park rules. (ER 97-101, 124). The letter describes the four times park rangers stopped CFM worship services in four different public places, Stewart and Conway's interactions with the rangers, the citations they received, and the difficulty they had with the permitting process, explaining their constitutional right to engage in religious worship and speech in public parks free of such burdensome permitting requirements. (ER 97-101). The Deputy City Attorney for San Francisco responded to the letter, but declined to address their concerns, suggesting they obtain a permit. (ER 125). Counsel wrote back and requested the City address the concerns mentioned. (ER 125). In response, counsel for the City wrote in an email stating § 7.03 and its application to Stewart and Conway are constitutionally valid. (ER 125-126).

Stewart and Conway are chilled and deterred from engaging in worship and religious speech in San Francisco public parks for fear of criminal citation and sanction. (ER 126).

### *Stewart and Conway Pursue Relief in Litigation*

Following unsuccessful attempts to work out an agreeable resolution with San Francisco, Stewart and Conway, on February 23, 2022, filed their verified complaint against the City and County of San Francisco, also naming Park Rangers Rosanna Perez, Jonathan Webb, and Jessica Wallace as defendants. (ER-102-137). Soon thereafter, on March 2, 2022, Stewart and Conway filed a motion for preliminary injunction, with accompanying exhibits (ER 74-101), seeking to enjoin San Francisco Park Code § 7.03, both facially and as applied to their worship activities in public parks. (ER 74-75). The City filed its opposition on April 23, 2022, along with supporting exhibits (ER 33-73) and a reply in support of the motion followed on May 10, 2022. (Doc. 31). The district court entertained oral argument on the motion for preliminary injunction on May 24, 2022.

### *Joint Statement Following Oral Argument*

Following oral argument, the parties, per directive of the lower court, filed a Joint Statement to provide supplemental information and briefing. (ER 23-32). Stewart and Conway filled in a portion asserting the content-based concerns with the Park Code's restriction on religious events, whether viewed in isolation or in the broader context of § 7.03. Stewart and Conway also informed the district court of injunctive relief sought from the permit requirements, detailing the scope of the injunction sought, specifying an injunction that would enjoin the City from enforcing

19

and applying § 7.03 to require a permit for religious events generally, or for amplification, or for tables used in religious events, in San Francisco public parks. (ER 25-28). Therein, they confirmed they would engage in a religious gatherings on short notice of less than four hours in a public park. (ER 27).

In its portion of the Joint Statement, the City contended its Park Code must viewed as a whole when evaluating its constitutionality. It claimed the Park Code treats religious events equally with other expressive events and more favorably than social gatherings. (ER 28-31). San Francisco also objected to the proposed injunction, urging that tables under § 7.03(t), as well as amplification and religious events, should be subject to permitting process. (ER 31). The City further expounded on the ramifications of the court granting the requested injunction, assuring "if the Court grants Plaintiffs' request to enjoin Section 7.03(h), Plaintiff's would be *worse off* because Plaintiffs would have to satisfy the permit requirements for social gatherings under Section 7.03(j) and therefore would need a permit for 25 persons or more." (ER 29 emphasis in original).

Stewart and Conway replied in the Joint Statement that the threat to apply the "social gatherings" rule to them would bring its own constitutional concerns, underscoring the vague nature of the ordinance, pointing out how the City would still treat religious speech worse than virtually all other speech. (ER 27).

20

### *District Court Enjoins Regulation on Religious Events*
### *Without Granting Relief for Other Park Code Provisions*

The district court issued its Order on June 22, 2022, granting in part and denying in the part the Motion for Preliminary Injunction. (ER 5-22). The Court enjoined § 7.03(h)'s numerical restrictions on religious events but declined to enjoin §7.03(m) (sound amplification). The court also failed to address Stewart and Conway's challenges to § 7.03 (i) ("musical performance") or § 7.03(t) ("structures") or their objection to the City's application of § 7.03(j) ("social gatherings") to worship upon the court enjoining § 7.03(h). (ER 5-22). Needing relief, Stewart and Conway filed timely Notice of Appeal. (ER 138-139).

## SUMMARY OF ARGUMENT

Protection afforded free speech is nowhere stronger than a public park, a place set aside by the U.S. Supreme Court as a traditional public forum for expression. Stewart and Conway have repeatedly tried to make use of this venerable venue in San Francisco to conduct their weekly worship services, involving a modest number of attendees, sound amplification to hear the sermon and praise songs, and a small portable folding table to hold bread and wine for communion, along with other components of worship. But the City has consistently rebuffed their efforts, in multiple parks, citing an assortment of park rules.

San Francisco mandates a permit for a religious event, or if estopped from using this rule, utilizes a rule for "social gatherings" instead. Moreover, the City

21

requires Stewart and Conway get a permit for using amplification with their praise songs and another permit for using a small portable folding table to facilitate their communion. These applications are unconstitutional and the regrettable fruit of a facially unconstitutional ordinance.

With this appeal, Stewart and Conway urge the Court to reverse and remand the decision below, instructing the district court to enjoin all of § 7.03 that impede on Stewart's and Conway's religious worship in public parks, and specifically, the application of § 7.03 (j) (social gatherings), § 7.03(i) (sound amplification for "musical performances") and § 7.03(t) (structures) to their corporate worship, and affirm the district court's previously entered injunction on § 7.03(h) (religious events). In granting this relief, the Court should consider instructing the lower court to enjoin § 7.03 in its entirety. The permit scheme is so infused with constitutional flaws it cannot possibly be salvaged.

## STANDARD OF REVIEW

All issues presented on this appeal – relating to the constitutionality of the Park Code and its application under free speech, free exercise of religion, due process, and equal protection clauses of U.S. Constitution and California Constitution – are subject to *de novo* review. Although a district court's decision to grant or deny a preliminary injunction is generally reviewed for abuse of discretion, "the district court's interpretation of the underlying legal principles . . . is subject to

de novo review and a district court abuses its discretion when it makes an error of law." *Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (citation omitted). Also, in cases concerning First Amendment issues, like this one, the appellate court "review[s] constitutional facts *de novo*" without deference to the district court. *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021). The requisite analysis anticipates the Court "mak[ing] an independent examination of the whole record" to ensure "the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)).

## ARGUMENT

The court below granted Stewart's and Conway's motion for preliminary injunction in part; however, enjoining § 7.03(h) and its 50-person trigger for "religious events" offer them no meaningful relief. In fact, granting the injunction in this way compounds the concern. Though San Francisco is precluded from using § 7.03(h), it is still armed with a quiver of dubious permit requirements and insists on using them. The City threatens to characterize worship as a "social gathering" and subject it to the 25-person trigger of § 7.03(j) now that the 50-person trigger of § 7.03(h) is no longer available. And the City continues to regulate essential elements of Stewart's and Conway's worship, *i.e.*, use of sound amplification for

praise songs under §§ 7.03(i) & 7.03(m) and use of a table for communion under § 7.03(t).

To obtain a preliminary injunction from these constitutional infringements, the movants must demonstrate (1) a likelihood of success on the merits; (2) irreparable harm if relief is denied; (3) the balance of the equities favors the movant; and (4) the public interest favors granting relief. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). A stronger showing on one of the first two elements may offset a weaker showing on another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–33 (9th Cir. 2011). This evaluation implicates a sliding scale, whereby "serious questions going to the merits and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotations omitted). Stewart and Conway meet these factors. At a bare minimum, they raise serious questions about the constitutional concerns specified herein.

The hopelessly flawed Park Code is unconstitutional as applied to Stewart's and Conway's worship in public parks and on its face. San Francisco's ongoing threat of using its accumulation of park rules against Stewart and Conway causes them to suffer irreparable harm, suppressing their religious expression in traditional

public fora in violation of the federal and California constitutions. The City has no legitimate interest in perpetuating these constitutional violations against them. And the public maintains a strong interest in keeping expressions of religion faith in public fora free from governmental interference. For all these reasons, Stewart and Conway should receive the injunctive relief they seek in this action.

## I. STEWART AND CONWAY WILL VERY LIKELY SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS

Stewart and Conway draw attention to "serious questions" about their constitutional claims and demonstrate more than a "fair chance" of succeeding on them. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). The existence and enforcement of San Francisco Park Code § 7.03 foreclose Stewart's and Conway's ability to worship in public parks, impinging on constitutional rights, particularly, free speech, free exercise of religion, due process, and equal protection rights.

### *Legal Standards for Claims Brought*

#### Free Speech

Stewart and Conway wish to participate in public worship, consisting of prayer, singing, playing of musical instruments, recitation and preaching of bible passages, and communion, among other expressive religious activities. Worship as well as activities that make up worship are deserving of constitutional protection. *See Widmar v. Vincent*, 454 U.S. 263, 269 (1981) (religious worship and discussion

25

protected); *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981) (oral dissemination of religious views protected); *Edwards v. South Carolina*, 372 U.S. 229, 236 (1963) (religious songs and even "religious harangue" protected). The U.S. Constitution and California Constitution also guard sound amplification as a protected right. *Saia v. New York*, 334 U.S. 558, 561 (1948); *Cuviello v. City of Vallejo,* 944 F.3d 816, 825 (9th Cir. 2019).

The extent a government entity can legitimately curtail protected speech depends on "the character of the property" where the speech is sought. *Frisby v. Schultz*, 487 U.S. 474, 479 (1988). Under the liberty of speech clause in the California Constitution, speech is deserving of protection unless the communication is "basically incompatible with the normal activity of a particular place at a particular time." *Cuviello* 944 F.3d at 826 citing *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 855 (9th Cir. 2004). The free speech clause of the federal constitution offers a more categorical approach, marking parks, along with streets and sidewalks, as traditional public fora. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983); *ACLU of Nevada v. City of Las Vegas,* 333 F.3d 1092, 1099 (9th Cir. 2003). These public spaces "have immemorially been held in trust for the use of the public and, for time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515 (1939). Hence, First Amendment protection is "nowhere stronger than in

26

streets and parks…." *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). The evaluation of speech restrictions in these unique areas contemplate a higher level of scrutiny. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012) (setting out analysis for public fora).

San Francisco public parks and the United Nations plaza are traditional public fora as well as compatible places for Stewart's and Conway's religious expression. In such venues, prior restraints, like the San Francisco Park Code, are legally suspect, whether challenged under California or U.S. Constitution. *Epona v. Cty. of Ventura*, 876 F.3d 1214, 1222 (9th Cir. 2017); *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 2004). A prior restraint is a restriction that makes the enjoyment of freedoms contingent on the will of a government official, *Epona*, 876 F.3d at 1222, "presents peculiar dangers to constitutionally protected speech[,]" *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002) (citation omitted), and poses one of the "most serious and the least tolerable infringement[s]" on free speech. *Id*. (citation omitted).

To pass constitutional muster, a prior restraint regulating speech in a traditional public forum must qualify as a reasonable time, place, or manner restriction, *Berger*, 569 F.3d at 1036, meaning, the restriction must be justified without reference to content, narrowly tailored to meet a significant government interest, and leave open ample alternative channels of communication. *Id.* Content-

based restrictions are presumptively unconstitutional. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *ACLU v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006). The municipality "bears the burden of justifying the regulation of expressive activity in a public forum such as the [parks,]" *Berger*, 569 F.3d at 1035, by showing the ordinance serves a compelling government interest and is narrowly drawn to achieve this interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115, 118 (1991); *see Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011) ("the least restrictive means to further a compelling interest").

Also, a permit scheme may not allow for overly broad licensing discretion in the handling of permits. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1024 (9th Cir. 2009). A prior restraint must have "narrow, objective, and definite standards to guide the licensing authority" to overcome scrutiny. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969). And neither can a prior restraint improperly impose an objective burden on religious scruples. *See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002) (identifying an "objective burden" a permit scheme can place political or religious scruples).

**Free Exercise**

A free exercise violation may be demonstrated when a governmental law or policy is not neutral or generally applicable. *Employment Div.*, *Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872, 879-881 (1990). The government fails the general applicability test if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

A free exercise violation can also be shown when "official expressions of hostility" accompany a law or policy that burdens a religious exercise. In such cases, the Supreme Court has "set aside such policies without further inquiry." *Kennedy v. Bremerton Sch. Dist*., 142 S. Ct. 2407, 2422 n. 1 (2022) (internal citations and quotations omitted).

**Due Process**

A law contravenes the due process clause when "its prohibitions are not clearly defined" or otherwise neglects to supply fair warning that the activity is subject to criminal penalty. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The failure to inform a person of ordinary intelligence of what is prohibited under the law invites arbitrary and discriminatory enforcement by government officials, causing the law to be "void for vagueness." *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). And a heightened standard applies in cases where First Amendment rights are at stake. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 793 (2011).

**Equal Protection**

The equal protection clause requires all persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living* Ctr., 473 U.S. 432, 439 (1985). Governmental distinctions among similarly situated groups adversely affect fundamental rights and receive the most exacting scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

### A. Section 7.03 is Unconstitutional As Applied to Stewart's and Conway's Worship in Public Parks

San Francisco applies § 7.03 to Stewart's and Conway's religious worship so as to eliminate this activity from City parks. After park rangers first stymied their worship in Palace of Fine Arts park, Stewart and Conway tried other parks in the City and even a place that is not a park (U.N. Plaza), modified the number of people with them as well as their amplification use, attempted to go through the permitting process, all good faith efforts to comply with park rules so they could carry on with their worship, but no matter what they do, the City always finds some park rule to use against them.

San Francisco culls from the long list of rules in its Park Code to hinder Stewart's and Conway's worship activity. The City cited CFM for putting on a "religious event" with 50 or more people [§ 7.03(m)], conducting a "musical performance" with sound amplification [§ 7.03(i)], and using a "structure[]" [§ 7.03(t)], without the requisite permit. And now, constrained from invoking the

30

restriction on religious events, San Francisco breaks out another park rule, § 7.03(g) for "social gatherings," to check Stewart's and Conway's worship activity.

San Francisco's assorted and strained applications of the Park Code to Stewart's and Conway's protected expression violates their constitutional rights.

### 1. San Francisco unconstitutionally applies § 7.03(j) regulating "social gatherings" to worship

The lower court's injunction of § 7.03(h) dealing with religious events of 50 or more people is of little benefit to Stewart and Conway as long as San Francisco can bait and switch park rules and brand worship as a "social gathering" under § 7.03(j), subjecting them to a 25-person limit instead. The operative phrase "social gatherings" is nebulous and easily finessed, as shown by the City's decision to regulate a worship service under the rule. This convenient interpretation violates Stewart's and Conway's constitutional protections regarding free speech, due process, and free exercise of religion.[1]

### a. application of "social gatherings" park rule violates free speech

---

[1] The district court did not address the impact of San Francisco applying the "social gatherings" rule to Stewart's and Conway's worship in public parks in its ruling on the motion for preliminary injunction. (ER 5-22). Although the City has not yet cited Stewart and Conway for having a social gathering in a park, it promised to apply § 7.03(j) to Stewart and Conway should the court enjoin the "religious events" rule, which, of course, has transpired. (ER 29). And Stewart and Conway notified the district court of their objection to the application of the "social gatherings" rule to their worship activity. (ER 28).

The Park Code's regulation of "social gatherings" is a content-based restriction - and it fails to meet strict scrutiny. The application lacks a compelling interest and is not narrowly drawn to meet one.

Section 7.03(h) restriction on religious events is obviously content based, as the district court acknowledged (ER 12-14), because it "define[s] regulated speech by particular subject matter." *Reed*, 576 U.S. at 163. But the City's swapping of "religious events" for "social gatherings" does not quell the concern. The phrase "social gatherings" is similarly premised on content and discriminates against Stewart's and Conway's religious content, considering how the City exempts other, non-religious content from the same requirements. And in shoehorning Stewart's and Conway's worship into the category of "social gatherings," the City imposes a burden that is even more onerous on them, requiring they obtain a permit with only 25 people present.

In *Reed*, the town's sign code treated different types of signs differently, some more favorable than others, depending on whether the signs were depicted as temporary directional, political, or ideological. *Id*. at 159-62. And because the analysis used to distinguish between these signs involved inspection of content, the Court deemed the code content based and appropriate for strict scrutiny. *Id*. at 165. Similarly, this Court, in *Boyer v. City of Simi Valley*, found exemptions to a general prohibition in an ordinance content based. 978 F.3d 618 (9th Cir. 2020). There, a

city ordinance precluded mobile billboards from parking on public streets but exempted certain "authorized vehicles" from the ban, that being, emergency, construction, repair, and maintenance vehicles. *Id.* at 621-22. In light of how the general prohibition and exemptions treated content in divergent ways, this Court held the ordinance content based. *Id.* at 622.

The Court should reach an analogous conclusion here. San Francisco deals with different activities differently, depending on the content associated with the activity. Anything depicted as a "social gathering" requires a permit, provided the number in the gathering is 25 or greater. But while the City deems Stewart's and Conway's worship a "social gathering," it does not do same with "any exhibit, promotion, dramatic performance, theatrics, pantomime, dance, fair, circus, festival, juggling or other acrobatics or show of any kind or nature," or "any amusement show, movie or entertainment" or "any speech," exempting these activities from a numerical requirement. §§ 7.03(e), (f), (g). Thus, while Stewart and Conway are unable avoid the permitting process, even if they put on their religious event with less than four hours of publicity, all these other events fall outside the restraint. Should Stewart and Conway decide to put on a play, a juggling act, or a pantomime routine, they need not fret about the number of people present, no permit is needed, but with worshipping, they must ensure their number is less than 25 to elude the permitting process and burdens that come with it.

Moreover, if an activity classifies as petitioning, leafletting, demonstrating, or soliciting under § 7.03(b), it too is treated more favorably than Stewart's and Conway's worship, and again, due to the content. These activities, which all have a social component to them, do not require a permit unless the activity involves 50 or more participants (not inclusive of recipients or on-lookers) within a circumference of 500 feet. The discriminatory treatment turns entirely on content.[2]

The upshot for Stewart and Conway, following the district court's injunction, is that they must still obtain a permit for worshipping in San Francisco public parks due to the number of people attending their event, just now, they must do so with half the number of people. The City offers no rational justification for regulating a worship event hazily depicted as a "social gathering" while allowing similar activities to proceed without this governmental intrusion. There was no compelling reason to impose a permit requirement on worship premised on 50 people and there is certainly none with 25 people.

### b. application of "social gatherings" park rule violates due process

The City's construction of language in its Park Code creates ambiguity and invites unbridled discretion with the regulation of religious expression in public parks, placing religion at a clear disadvantage. This concern is underscored by San

---

[2] The prior restraint in § 7.03(j) is also invalid for placing an objective burden on Stewart's and Conway's religious scruples. *Watchtower*, 536 U.S. at 167.

34

Francisco's arbitrary decision to label Stewart's and Conway's worship activity a "social gathering" under § 7.03(j) after previously referring to the activity a "religious event" under § 7.03(h).

The phrase "social gathering" is amorphous, overly broad, giving too much discretion to the officials to determine what it means and what it includes. In *City of Chicago v. Morales*, the Supreme Court addressed a like predicament, reviewing a law criminalizing "loitering" but failing to "clearly articulate what conduct was prohibited." 527 U.S. 41, 51 (1999). Striking down the law as it applied to lawful behavior, the Court held the vagueness that doomed the ordinance concerned confusion on "what loitering is covered by the ordinance and what is not." *Id*. at 57.

The strained application of the "social gatherings" park rule to worship or other religious events suffers from this same defect. Stewart's and Conway's activity falls squarely within the "religious event" category and park rule. Such understanding was confirmed by San Francisco park rangers and officials. Thus, Stewart and Conway could not reasonably surmise the City would suddenly regulate their worship as a "social gathering" and for which a different permit requirement would apply.

Though worship has social aspects to it, the activity is predominantly a religious exercise. The entirety of § 7.03(j) requires a permit for "[p]articipation in a picnic, dance, or other social gathering," indicating that the other activities covered

by the rule are akin to a picnic or a dance, and no one would confuse a worship service with these activities. Of course, this perception of worship apparently includes San Francisco, which carved out a separate park rule for the regulation of religious events. The construction and application of § 7.03(j) to engulf Stewart's and Conway's worship is vague as applied and violates due process.

### c.  application of "social gathering" rule violates free exercise of religion

The Park Code is not neutral and "generally applicable," with the City deliberately plotting out different requirements for different types of activities.  And because the application of the "social gatherings" park rule to worship treats religion unfavorably, it acts to violate the free exercise of religion clause.   *Smith*, 494 U.S. at 879-881.

San Francisco's application of the "social gatherings" park rule to worship lacks general applicability because it regulates "religious conduct  while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Certain entertainment and amusement activities may be conducted without regard to the number of persons involved, as is true for any activity not specified in the ordinance. The inequitable treatment of religious activities, as compared to other activities, point to a free exercise of religion violation.

The City further demonstrates thinly veiled hostility toward religion. Threatening to apply the "social gatherings" rule to worship in the face of an injunction on the park rule explicitly applying to religious events, putting Stewart and Conway in an inferior position with the 25-person trigger under § 7.03(j), San Francisco evinces hostility toward religion.

### 2. San Francisco unconstitutionally applies §§ 7.03(i) and 7.03(m) to amplified praise songs in worship

On multiple occasions, San Francisco issued citations to Stewart, Conway, and CFM for using amplification with praise songs in their worship, depicting the activity as a "musical performance" proscribed in § 7.03(i). Additionally, San Francisco applies § 7.03(m) (ER 52), which requires a permit for amplification as well.

Music is critical aspect of Stewart's and Conway's religious worship. "[R]eligious music plays a highly important role in the spiritual mission of the church" and for many worshippers "music constitutes a form of prayer that is an integral part of worship services and Scripture readings." *EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 804 (4th Cir. 2000) (citation omitted). Sound amplifying devices are also constitutionally protected, widely considered "indispensable instruments" of public speech, *Cuviello,* 944 F.3d at 825, because "a restriction on volume . . . can effectively function as a restriction on speech." *Saia*, 334 U.S. 561-62.

37

Consequently, San Francisco's application of § 7.03(i) & (m) to curb amplified praise songs encroaches on Stewart's and Conway's constitutional freedoms, violating speech clauses found in California Constitution and U.S. Constitution. And applying the permit requirement to praise songs through a park rule that is supposed to deal with a "musical performance" transgresses their right to due process as well.

### a. permit requirement for amplification in traditional public forum violates the liberty of speech clause in California Constitution and free speech clause in U.S. Constitution

A restriction on protected speech (Stewart's and Conway's religious expression) in traditional public fora (San Francisco public parks) must be narrowly tailored to meet a significant government interest to survive intermediate scrutiny. *Berger*, 569 at 1036. Section 7.03's permit requirements for amplification fall short of the constitutional requisite.

Section 7.03(i) requires a permit to "conduct or sponsor a concert or musical performance which (1) has been publicized four hours or more in advance, or (2) utilizes sound amplification equipment, or (3) involves a band or orchestra." In issuing citations to CFM, park rangers specified § 7.03(i) as the basis, portraying their praise songs in worship as a "musical performance." Additionally, in litigation, San Francisco has informed of its intentions to apply § 7.03(m). (ER 52). This subsection requires a permit for individuals in park who "[c]onduct or sponsor any

event which utilizes sound amplification equipment, as defined in Part II, Chapter VIII (Police Code) of the San Francisco Municipal Code.[3]

In defending against the motion for preliminary injunction in the court below, Bogetz, an official for San Francisco Recreation and Parks Department, submitted a declaration expounding on the purposes behind the permit requirements for amplification in the ordinance, referencing both § 7.03(i) and § 7.03(m), claiming a permit for amplified sound is needed to facilitate events while preserving quiet enjoyment of parks, avoiding inconvenience to neighbors, and minimizing conflicts between park users that can arise from loud noise. (ER 52, ¶ 6). Bogetz declines to elaborate on these purported concerns any further. She does not explain why anyone would expect a public park to be quiet or why San Francisco automatically equates amplification to inconvenience or loud noise. But even assuming a legitimate interest in limiting excessive noise, forcing citizens to secure a permit to use amplification in public parks is not a narrowly tailored measure for achieving this goal.

This Court, in *Cuviello*, specifically held a permit requirement for amplification use in traditional public fora like public parks is not narrowly tailored and violates the liberty of speech clause of the California Constitution. 944 F.3d at

---

[3] The district court only analyzed § 7.03(m), but should have analyzed § 7.03(i) too, since park rangers repeatedly cited Stewart and Conway for violating this specific subsection.

829-31. This holding is seemingly binding on the instant matter. Ruling to the contrary, the district court held the *Cuviello* decision is distinguishable, emphasizing § 7.03(m) does not sweep as broadly as the requirement struck down by this Court because it does not apply to places in the city other than public parks. (ER 16). However, nothing in *Cuviello* suggests the principle this Court enunciated in the case is so limited.

Observing the import of sound-amplifying devices, this Court noted their aid in a "crowded park" where a single voice can be drowned out. *Id*. at 825. The Court also set out three guiding considerations that the district court overlooked: 1) whether the regulation achieves its ends without restricting substantially more speech than necessary, 2) whether there are obvious alternatives that would achieve the objectives with less restriction on speech, and 3) whether it is needed to regulate other expressive activity. *Id*. at 828-29. Weighing these considerations reveals the permit requirements for amplification in § 7.03 are unconstitutional just like the one this Court struck down in *Cuviello*.

San Francisco's permit requirement on amplification restricts far more speech than necessary to address any legitimate concerns about excessive noise. To be sure, by focusing on amplification instead of volume level, the City fails to adequately connect the restriction to its purported interest. The permit requirement in § 7.03(m) contains no objective criteria for volume, time, or space of the amplification. And,

40

with § 7.03(i) regarding a "musical performance", a permit is mandated for any kind of amplifying device, failing to distinguish between a microphone or small portable speaker that connects to an iPhone by Bluetooth and a massive sound system that could disturb or awaken people in nearby neighborhoods. *Cf. Grayned*, 408 U.S. at 116 (the government may turn down "overamplified loudspeakers"). The viable alternative to these overinclusive regulations is to have a permit requirement for excessive decibel levels, which would be far more precise for addressing excessive noise concerns and without intruding on constitutionally protected expression.

Sections 7.03(i) & (m) violate the free speech clause in the U.S. Constitution as well as the liberty of speech clause set out in the California Constitution, which protects speech more broadly. *See Kuba*, 387 F.3d at 856.

### b. applying permit requirement for amplification involving "musical performance" to praise music in worship violates due process

Park rangers cited CFM on several occasions for using amplification in a "musical performance" without a permit as required by § 7.03(i). The application is misguided. Stewart, Conway, and others in their company sing as part of their corporate worship service and those with microphones just happen to lead the singing. The activity is not a musical "performance" as that term is commonly understood. (ER 109). Consequently, San Francisco's interpretation of § 7.03(i) to include praise songs does not provide sufficient clarity about the permit requirement such that "ordinary people can understand what conduct is prohibited" or "in a

manner that does not encourage arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. Due process requires fair warning, *Grayned,* 408 U.S. at 108, which is notably missing here.

The application of § 7.03(i) to praise songs in worship is void for vagueness and violates due process.

### 3. San Francisco unconstitutionally applies § 7.03(t) to a portable folding table Stewart and Conway use for expressive purposes in worship

In § 7.03(t), San Francisco requires a permit for anyone "station[ing] or erect[ing] any table, scaffold, stage, platform, rostrum, stand, bandstand, building, fence, wall, monument, dome, or other structure." This verbiage is broad and comprehensive, so much so, it could encompass virtually any object someone places on the ground of a public park, whether it be a tent, sculpture, cooler, or picnic basket. But according to Bogetz, the City's interest in such structures is much narrower. She states a permit is needed for items that can "interfere with the flow of pedestrian and vehicle traffic, damage park landscaping, or otherwise cause harm to the park." (ER 53, ¶ 8).

Against the backdrop of this stated interest, San Francisco applies § 7.03(t) to a small portable table Stewart and Conway wish to use for communion, an expressive activity that is an essential component of their worship service.[4]

---

[4] The district court did not rule on or evaluate Stewart's and Conway's challenge to § 7.03(t). Admittedly, there was some confusion on this point. During the oral

### a. application of § 7.03(t) to a small portable folding table used for communion in worship violates liberty of speech clause in California Constitution and free speech clause in U.S. Constitution

Much like the sound amplification needed for praise songs in a worship service, the small portable folding table Stewart and Conway employ for communion is an "indispensable instrument" of their religious worship and speech. *Cuviello*, 944 F.3d at 825.

The "erection of tables in a public forum is expressive activity protected by our Constitution to the extent that the tables facilitate the dissemination of First Amendment speech." *ACLU of Nevada*, 466 F.3d at 799. This is precisely how Stewart and Conway wish to use their portable table, it is "used to disseminate speech-related materials." *Id.*; *see also One World One Family Now, Inc. v. Nevada*, 860 F. Supp. 1457, 1462-63 (D. Nev. 1994) (portable tables protected by the First Amendment because of their limited use in facilitating the sale of expressive items).

---

argument on the motion for preliminary injunction, counsel did not mention § 7.03(t) as one of the concerns. However, Stewart and Conway did specify the need to enjoin § 7.03(t) and the permitting requirement for a portable table in the memorandum in support of the motion (Doc. 13-8), San Francisco argued against an injunction on § 7.03(t), urging the need for applying a permit to Stewart's and Conway's portable table in its opposition to the motion (Doc. 23), submitted a declaration from Bogetz in an attempt to substantiate the argument (ER 53), and Stewart and Conway countered San Francisco's argument about § 7.03(t) in their reply (Doc. 31). Adding further clarity, in response to the court's request to detail the scope of the sought-after injunction, in the joint statement following oral argument, Stewart and Conway reiterated the need to enjoin § 7.03(t)'s requirement of a permit for a table and San Francisco argued against this portion of the injunction. (ER 27, 29).

Participants in CFM worship "come to the table" to participate in communion during worship, in remembrance of what is known as the "Lord's supper," receiving wine and bread as symbolic features of the Christian faith. This use qualifies as protected expression.

And the small portable folding table poses no legitimate threat to traffic flow, damage to park property, landscaping, or interference with other activities. Different from a permanent structure, monument or a tent, the portable table employed by Stewart and Conway is "temporary and easily movable." *Tucker v. City of Fairfield*, 398 F.3d 457, 462-463 (6th Cir. 2005) (balloons used in protests were constitutionally protected because the use "has not been shown to cause any danger that could justify a restriction…"). Thus, a permit requirement for the expressive use of a small portable folding table violates Stewart's and Conway's right to free speech.

Applying § 7.03(t) regulation to their small portable folding table is not narrowly tailored to meet any significant government interest.

### b. application of § 7.03(t) to a small portable folding table used for communion in worship violates due process

The City construes § 7.03(t)'s rule on "tables" and "other structures" to incorporate a small portable folding table, equating this item with significantly larger, immovable structures like a fence, monument, or a tent. The inclusion is unexpected. Being small and temporary, and placed in the grass, not in a pathway,

the small table cannot possibility create any difficulty with travel or damage to property.

Requiring a permit for this type of table, subjecting Stewart and Conway to a criminal fine for failing to secure said permit in advance, violates their right to due process.

### 4. San Francisco fails to leave Stewart and Conway with any open ample alternative channels of communication

Regarding Stewart's and Conway's free speech claim under both California Constitution and U.S. Constitution, the far-reaching application and implications of San Francisco's Park Code also deprives them of ample alternative means of their communication, *i.e.*, worship in public parks.

Searching for a place to worship, Stewart and Conway explored every possible option in the San Francisco park system, trying numerous parks, a popular park, a remote park, a park where amplification was not needed as much, and a place that is not a park. They attempted to obtain a permit to carry on with their worship in a public park. But every door was closed to them, no option was viable. In that public streets and sidewalks are not suitable for worship purposes, by denying public parks, San Francisco effectively deprives Stewart and Conway of any public venue for their worship, leaving them with no ample alternative means for their communication.

### B.  Section 7.03 is Unconstitutional on its Face

The root of the inappropriate applications of § 7.03 - to which Stewart and Conway suffer - is § 7.03 itself. The Park Code consists of an incongruent patchwork of content-premised rules that serve to adversely affect free speech. The scheme is also saturated with vague, ambiguous language that give officials undue discretion to shut down disfavored expression, triggering due process concerns. And because the Park Code effectually provides different sets of rules and permit requirements for different groups and activities, it violates the equal protection clause as well.

### 1.  The ordinance violates liberty of speech clause in California Constitution and free speech clause in U.S. Constitution

San Francisco's Park Code violates free speech by restricting protected expressive activities through a host of rules turning on content. A regulation is content based if it "singles out certain speech for differential treatment based on the idea expressed." *Foti v. City of Menlo Park*, 146 F.3d 629, 636 n. 7 (9th Cir. 1998); *see City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022), citing *Reed*, 576 U.S. at 163 ("target[s] speech based on its communicative content"—that is, if it "applies to particular speech because of the topic discussed or the idea or message expressed"). A content-based restriction can either be explicit or implicit, defining speech by "function or purpose" *Reed*, 576 U.S. at 164. "[T]he fact that a distinction is event based does not render it content neutral." *Id.* at 171.

46

Section 7.03 is peppered with restrictions that explicitly or implicitly regulate content on their face, as follows:

(a) parade
(b) petitioning, leafletting, demonstrating, soliciting
(c) solicitation
(d) sales of communicative materials
(e) exhibit, promotion, dramatic performance, theatrics, pantomime, dance, fair, circus, festival, juggling or other acrobatics
(f) performance, amusement show, movie, entertainment
(g) speech
(h) religious events (50 or more persons)
(i) concert, musical performance amplification
(j) picnic, dance, or other social gathering (25 or more persons)
(k) sell or provide food
(n) exhibition
(o) animal show
(p) wedding
(q) art show
(s) kite-flying event by club or organization

Subsections (b), (c), (d), and (g) all proscribe activities defined by their expressive purpose, like leafletting and speech-making. Similarly, subsections (a), (e) and (f) focus on the communicative function of the activity in determining whether the speech requires a permit. Other provisions are linked to content of the activity, whether involving music [subsection (i)], animals [subsection (o)], weddings [subsection (p)] or art [subsection (q)]. And subsection (k) concerning kite-flying is premised entirely on the identity of the participants. Of particular concern to Stewart and Conway, § 7.03(h) requires a permit for participating in a

47

"religious" event of 50 people or more,[5] and § 7.03(j) implicates content with a permit requirement on "social gatherings." Other subsections regulate the aid of tangible items needed for facilitating an expressive event, like:

> (m) sound amplification
> (r) amusement park device
> (t) "structures"

The prevalence of content-based restrictions in the Park Code makes the scheme facially unconstitutional. San Francisco offers no compelling need for these regulations, much less a showing that they are narrowly drawn to meet a compelling interest. But even if intermediate scrutiny was applicable, § 7.03 could not meet the criteria required for a reasonable time, place, and manner regulation. The scheme is not narrowly tailored to serve a significant government interest.

While the Supreme Court recognizes the propriety of a government entity regulating competing uses of public property, *e,g. Forsyth Cty.*, 505 U.S. at 130, there is no valid interest in the City learning the details of speech to avoid inconvenience or to impose insurance demands on citizens. Also, the speakers themselves are best suited to determine what areas work for their expressive purposes. "[O]ne is not to have the exercise of his liberty of expression in

---

[5] Though the district court enjoined that subsection, it remains in the Park Code.

48

appropriate places abridged on the plea that it may be exercised in some other place."
*Schneider v. New Jersey*, 308 U.S. 147, 163 (1939).

In addition to the need for legitimate and significant interests, the permitting scheme must also be narrowly tailored, in other words, it must "target[] and eliminate[] no more than the exact source of the evil it seeks to remedy." *Frisby*, 487 U.S. at 485. Section 7.03 misses the target, going far beyond the stated interests, in various respects. San Francisco does not explain how its content-laden scheme is linked to its any of its stated interests. It is not apparent, for instance, why a permit is required for events that are religious or social in nature. Nor is it evident why San Francisco must know and approve of someone using a folding table, no matter how small, or an amplifying device, no matter how quiet. These requirements do not advance the City's supposed interests in maintaining a permitting system.

Mandating individuals obtain governmental permission for expressive activities in a traditional public forum is not a narrowly tailored way of addressing any legitimate concerns. The very process of seeking and obtaining a permit can be intimidating and overly burdensome. *See Baldwin v. Redwood City*, 540 F.2d 1360, 1371 (9th Cir. 1976) (holding application forms that call for detailed information, among other things, affect the burdensomeness of a permit). In particular, here, permit requirements for religious events, social events, portable tables, and amplification are not sufficiently tailored measures for any legitimate purposes. *See*

49

*Cuviello*, 944 F.3d at 829-31 (holding a permit requirement for amplification use not narrowly tailored and violative of the liberty of speech clause of the California Constitution).

Aside from the permit requirements themselves, § 7.03 imposes attendant burdens on the speech after determining a permit is mandatory, including a health and safety plan, a certificate of insurance for coverage of two million dollars, payment of a permit fee, and a bond. Such fees unrelated to costs of the space make a permit requirement unreasonable. *Baldwin*, 540 F.2d at 1371. Another concern relates to the forced divulgence of identity and details of the speech activity. The Supreme Court has consistently struck down laws curbing the freedom of citizens to anonymously engage in public expression. *E.g., Watchtower*, 536 U.S. at 166-67; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 451, 462 (1958). Demanding citizens identify themselves for a right to speak is an affront to First Amendment principles. *Watchtower*, 536 U.S. at 166-67. Moreover, requiring individuals to reveal the group with whom they are associating wrongly suppresses speech and association. Anonymity is needed to safeguard against biased decisions. *See Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960) ("[C]omplusory disclosure of the membership lists of the local branches of the National Association for the Advancement of Colored People would work a significant interference with the freedom of association of their members").

Section 7.03 violates free speech principles, under both state and U.S. constitutions, on its face.

### 2. The ordinance violates due process

The Park Code is also rife with vague verbiage, and couched in a prior restraint mechanism, is prone to arbitrary decision-making. Section 7.03(j) requiring a permit for a "social gathering" is a relevant example. Almost any gathering of persons could be called a "social gathering." Indeed, many activities identified as something else in the Park Code contain "social" elements, including the "religious events" of § 7.03(h), the list of entertainment and amusement activities in (e) and (f), as well as an exhibition, animal show, wedding, or art show. But instead of supplying a definition of "social gathering" or, for that matter, clear regulations that apply to all groups of a specified size, the Park Code imposes an unwieldy catalogue of indefinite standards, leading to impermissibly broad discretion in the decisions about use of space. "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323, citing *Forsyth Cty.*, 505 U.S. at 131. This risk is paramount with the San Francisco Park Code.

Illustrative of the capricious power imbedded in the permitting process, upon forcing CFM and Conway to obtain a permit for their worship activity, a park official unilaterally altered the terms of their permit, moving their location from U.N. Plaza

to an undesirable portion of McClaren Park. (ER 83-96, 122). The park official presumed to know where CFM should conduct their worship service. And, as an added burden, the park official warned CFM to keep any sound from traveling beyond their small, designated space. Virtually any sound travels beyond the space where one is situated. But in failing to abide by this added requirement, San Francisco required a park ranger to staff the event at an extra cost to CFM. (ER 89, 123(. Section 7.03 violates due process on its face.

### 3. The ordinance violates equal protection

The Park Code handles different activities differently, isolates select activities as needing a permit for use of park space and then treats these select activities unevenly.

Some events require permits regardless of the number of persons. Other subsections hinge on both content and the number participating, *e.g.*, § 7.03(h) ("religious events" of 50 or more) and § 7.03(j) ("social gatherings" of 25 or more). Certain entertainment or amusement activities have no numerical limitations at all so long as participant refrain from publicizing the event at least four hours beforehand, *e.g.*, an "exhibit, promotion, dramatic performance, theatrics, pantomime, dance, fair, circus, festival, juggling or other acrobatics." §§ 7.03(e), (f), (g). A pantomime or a juggling act or even a circus can involve an unlimited number of people, while events depicted as a "social gathering" are saddled with a 25-person

limit before requiring a permit. And any activity not explicitly mentioned in the Park Code has no permit requirement whatsoever, regardless of the number participating or advance publicity provided.

There is no rational, let alone a compelling, reason for these distinctions, violating equal protection.

## II.   UNLESS THIS COURT GRANTS INJUNCTIVE RELIEF, STEWART AND CONWAY WILL SUFFER IRREPARABLE HARM

The City must maintain an appropriate balance between its legitimate interests "and the effect of [its] regulations on First Amendment rights." *Watchtower*, 536 U.S. at 163. Application of § 7.03 to Stewart's and Conway's worship is out of balance.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Cuviello*, 944 F.3d at 833; citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Irreparable harm has already occurred and is certain to escalate due to the City's threat to treat CFM's worship as a "social gathering" subject to § 7.03(j) (25-person trigger) now that the district court has enjoined § 7.03(h)'s limit on "religious events" (50-person trigger).

## III.   ALLOWING STEWART AND CONWAY TO WORSHIP IN THE PUBLIC PARK IS HARMLESS TO THE CITY AND THE FREEDOM TO DO SO SERVES THE BEST INTERST OF THE PUBLIC

The balance of equities tips heavily in favor of Stewart and Conway in this case. "[C]hilling of [their] free speech rights . . . favors a preliminary injunction."

53

*Cuviello*, 944 F.3d at 834. Upholding free expression in a public park—a quintessential traditional public forum—is a "consistently recognized" and an important interest. *Assoc. Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

San Francisco cannot point to any tangible harm for merely complying with constitutional principles. Indeed, the injunction would offer San Francisco time to reflect and an excellent opportunity to revamp its unconstitutional scheme and replace it with an equitable, streamlined code containing clear rule or rules that apply equally to all types of content and events.

And finally, it is in the public's best interest to allow members of the public equal opportunity to use the parks for expressive purposes.

## CONCLUSION

San Francisco has manipulated its Park Code to place roadblocks in the way of Stewart's and Conway's protected worship, leaving them with no public place for their religious activity.

A preliminary injunction ensuring Stewart's and Conway's freedom to worship in a public park is warranted and the district court failed to supply it. For the reasons stated herein, Stewart and Conway respectfully ask this Court to reverse the Order below in part, remanding with instructions for the district court to enjoin § 7.03 so as not to impose a permit requirement on worship activity in public parks and affirming the injunction of § 7.03(h).

Respectfully submitted,

Dated: August 24, 2022

s/Nathan W. Kellum
Nathan W. Kellum
Attorney for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 24, 2022. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Nathan W. Kellum
Nathan W. Kellum

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-16018

I am the attorney or self-represented party.

**This brief contains** | 13,246 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Nathan W. Kellum     **Date** | Aug 24, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                               *Rev. 12/01/2018*